**Robert A. ARONSON, Plaintiff,**

**v.**

**INTERNAL REVENUE SERVICE, et al., Defendants.**

**Civ. A. No. 89–1914–WD.**

United States District Court,
D. Massachusetts.

June 24, 1991.

---

Richard W. Lubart, Richard Lubart, Brookline, Mass., for plaintiff.

Frank Albert Libby, Jr., U.S. Atty., Boston, Mass., Kathryn Brown, Dept. of Justice, Tax Div., Washington, D.C., for defendants I.R.S., Nicholas F. Brady and Frederick T. Goldberg.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff, Robert A. Aronson, initiated a request under the Freedom of Information Act ("FOIA") to obtain Internal Revenue Service ("IRS") records pertaining to those individuals with undistributed income tax refunds. Thereafter, frustrated by the IRS's lack of response to his request, Aronson filed suit to compel release of the materials. The IRS, which withheld the information, contends that it is protected under FOIA Exemption 3, as subject to withholding under the Internal Revenue Code, and Exemption 6, as an unwarranted invasion of personal privacy.

Before me are cross motions for summary judgment. Acting on these motions, I will order disclosed to Aronson records of the names and last known mailing addresses of those taxpayers still due refunds for

tax years 1981 through and including 1987. However, I will decline to order disclosure of the identifying number, amount of refund due, and the particular tax years involved for each of these taxpayers.

I

A. ARONSON'S REQUEST

Aronson submitted his original FOIA request in May, 1989. He requested "the entire file of undistributed income tax refunds for the tax years 1981 through and including 1987," including the name of each taxpayer due a refund, his or her last known address and taxpayer identifying number and the amount of refund due.[1] In June, 1989, the IRS notified Aronson that it needed additional time to respond to his request. Aronson did not hear again from the IRS until after he filed this law suit on August 23, 1989.

Aronson is an attorney who by his own account also "locates and identifies unclaimed and apparently abandoned money and other property held by state and federal governments." Using what he describes as sophisticated "tracing" techniques, he attempts to locate the individuals entitled to such property and offers his services, on a contingent fee basis, to help them recover.

The IRS has confirmed that it has all the undelivered refund data requested by the plaintiff stored on a computer tape. At a hearing on this matter, I instructed counsel for the IRS to present evidence demonstrating, with respect to the last five years, what efforts the IRS has made to locate those taxpayers due refunds for the years in question, whether release of personal information was involved in these efforts and how effective the efforts were in achieving the distribution of refunds. While the subsequent submission of the IRS was incomplete with respect to the aforementioned issues, the IRS represented that it is currently "in the process of re-

trieving" for the plaintiff the requested "taxpayers' names, city state and zipcode [that] have been released to the press for 1981 through 1987." United States' Statement of Material Facts As To Which There Is No Genuine Issue, ¶ 9 (Feb. 15, 1991).

B. THE INFORMATION SOUGHT

The submissions of the IRS provide only a sketchy account of its handling of tax refund checks. Federal income tax refund checks are returned to the IRS undelivered for a variety of reasons, including incorrect mailing addresses, a prohibition on forwarding them and the fact that they will only be delivered to a "secure" mailbox. In the years 1988, 1989 and 1990, more than 70,000 refund checks, totaling over $40 million, were returned as undeliverable *each year*. IRS Public Affairs, News Release IR–88–152 (Nov. 15, 1988); IRS Public Affairs, News Release IR–89–138 (Nov. 9, 1989); IRS Public Affairs, News Release IR–90–143 (Nov. 27, 1990). The IRS's efforts to see that taxpayers eventually receive these checks consists of three types of procedures.

When a check is returned undelivered the IRS compares the mailing address used to those appearing on the tax return and in its own computer system. An undeliverable refund notice, which is forwardable and deliverable to an unsecured mailbox, is sent to the original address used or any more current address discovered. The notice requests the taxpayer provide a current address and sign and return the form. Return of this notice undelivered will trigger a second round involving the same procedure.

A separate program entails a media campaign conducted by IRS Public Affairs officers. The IRS issues news releases aimed at publicizing, on a nationwide and local level, the fact that many tax refunds remain undelivered. In addition, under its current Undelivered Refund Checks Pro-

---

1. Aronson also requested "a photocopy or duplicate of the 'Record Layout Chart' showing the identity, location and size of each field in each record which comprise the requested file." In

November 1989, the IRS supplied the plaintiff with such a "record layout chart" showing the arrangement of data stored for each record listing the individual due an undelivered refund.

gram,[2] lists containing the names of taxpayers due refunds, along with his or her city, state and zip code, are regularly released to the media for publication.[3]

Under another program, when a refund check is returned undelivered a "code is posted" on the taxpayer's account. Activity such as a change of address or filing a subsequent tax return in connection with the same account will trigger instructions to issue and mail a new refund check.[4]

The submissions by the IRS indicate that for refund checks initially returned as undeliverable in 1989, it was able to deliver over 80% of the checks by that year's end and approximately 90% of the refunds by August, 1990.[5] (No figures were submitted for previous years and those figures

for checks returned in 1990 remain incomplete.) However, the IRS has submitted no information whatsoever regarding the subsequent fate of the remaining undelivered refunds.

## II

## THE STATUTORY SCHEMES

The FOIA manifests a basic policy in favor of disclosure of government-held information. *FBI v. Abramson*, 456 U.S. 615, 630–31, 102 S.Ct. 2054, 2063–64, 72 L.Ed.2d 376 (1982). Nevertheless, because "public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352, 102 S.Ct. 1103, 1108, 71 L.Ed.2d 199 (1982), the mandate of broad disclosure

---

**2.** The IRS represented that this program has been conducted since at least 1982, Declaration of A. Wilson Fadely, ¶ 6 (IRS Public Affairs Officer) [hereinafter "Fadely Declaration"], *attached to* Mem. of Points & Auth. in Support of Defendant's Motion, docket no. 34, Ex. C, but attached as an exhibit to its filing is the program description from an out of date manual, *see* Taxpayer Serv.Hdbk. (*IR Manual*, 6810), (16)60, *et seq.* (1–25–83), *attached to* Fadely Declaration, Ex. 4. The program described therein, implemented in 1982 and said to have been "developed as a result of concern regarding those Federal income tax refunds which remain undelivered in spite of [previous] procedures to effect delivery," Taxpayer Serv.Hdbk., (16)61 (8–25–82), involved researching directories and making telephone calls to the taxpayer's last known address as well as to the two nearest neighbors, and inquiries to state and local agencies, in an effort to obtain current addresses for those due refunds.

Nothing in the submissions of the IRS indicates how long this program continued. Moreover, a GAO report, submitted by Aronson, states:

IRS officials told us that during 1985 they had discontinued active efforts to locate individual taxpayers who had not received their refunds because those initiatives were labor intensive and therefore costly.

U.S.Gen. Acc't Office, *Unclaimed Money* 30 (May 1989) (report to Sen. Hatch and Rep. Craig). The IRS has failed to controvert Aronson's statement that active efforts to locate individuals who had not received their refunds were discontinued in 1985. *Cf.* Local Rule 56.1 (uncontroverted facts set forth in the record will be deemed to be admitted). Nor has it challenged any of the other claims·made in the GAO report.

**3.** IRS procedures require each District to "develop a system for gauging the effectiveness of the undelivered refund check publicity efforts." *IR*

*Manual,* 6326.1:(4) (1–14–91). However, the GAO Report submitted by Aronson states:

IRS staff told us during this review that they did not have data on the extent to which the district offices currently were providing information on undelivered refunds to local media nor on how the local media were using this information.

U.S.Gen. Acc't Office, *Unclaimed Money* 30 (May 1989).

**4.** The IRS made no representation concerning how long the account remains in this state. The GAO report submitted by Aronson states that:

If IRS is unable to locate the taxpayer and there is no activity on the taxpayer's account for 3 consecutive years, the information is transferred from the active automated master file to the inactive microfilm retention register for future reference. A major drawback of the system is that once an account reflecting an undelivered refund drops from the automated master file, the system would not automatically draw attention to the refund, thus posing the possibility that those who do not file tax returns at least every 3 years will not receive their refunds.

U.S.Gen. Acc't Office, *Unclaimed Money* 30 (May 1989).

**5.** One affidavit submitted by the IRS claims that the IRS does not calculate and there are no records presently available concerning the dollar totals of undelivered refund checks. Declaration of Timothy F. Lynch, ¶ 7. However, another affidavit has attached to it press releases giving these figures for 1988, 1989 and 1990, which the declarant avers are "based upon figures contained in a computerized summary printout entitled 'District Totals of Undelivered IMF (Individual Master File) Refund Checks.'" Fadely Declaration, ¶ 4.

is far from absolute. FOIA contains nine explicit exemptions from the general rule of disclosure, "[t]o preserve certain necessary functions of government and to protect individuals who would be damaged by disclosure." *New England Apple Council v. Donovan*, 725 F.2d 139, 141–42 (1st Cir. 1984). These exemptions represent "the congressional determination of the types of information that the Executive Branch must have the option to keep confidential, if it so chooses." *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973), *superseded by statute as noted in, CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1142 n. 66 (D.C.Cir.1987), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988); *see also Baldrige v. Shapiro*, 455 U.S. at 352, 102 S.Ct. at 1108.

The two exemptions claimed here by the IRS involve an analysis of (A) whether the Internal Revenue Code itself protects the information sought from disclosure and (B) whether the disclosure of any unprotected information would be an unwarranted invasion of privacy.

### A. EXEMPTION 3 AND SECTION 6103

Exemption 3 of FOIA, the so-called "other statute exemption," excludes from mandatory disclosure material

> specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3).

■ It is well established that § 6103 of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 6103, generally qualifies as a statute within the scope of Exemption 3. *See Church of Scientology v. IRS*, 484 U.S. 9, 11, 108 S.Ct. 271, 273, 98 L.Ed.2d 228 (1987) (§ 6103 "is the sort of statute referred to by 5 U.S.C. § 552(b)(3) of the FOIA relating to matters that are 'specifically exempted from disclosure by statute ...'"); *DeSalvo v. IRS*, 861 F.2d 1217, 1221 (10th

Cir.1988). Thus, if § 6103 forbids the disclosure of certain material, that material may not be produced in response to a request under the FOIA. *Church of Scientology*, 484 U.S. at 11, 108 S.Ct. at 273. Section 6103(a) provides that "[r]eturns and return information shall be confidential [and shall not be disclosed] except as authorized by this title."

All of the information sought in Aronson's request falls within the scope of "return information" as defined by § 6103(b)(2), and is thus exempt from disclosure under FOIA, except as specifically authorized. Aronson concedes that "return information" is generally exempt from disclosure under the FOIA, but maintains that the *exception* created by § 6103(m)(1) provides otherwise in the case of disclosures concerning unclaimed tax refunds.

Subsection 6103(m)(1) is one of over a dozen subsections which "set forth various exceptions to the general rule that returns and return information are confidential and not to be disclosed," *Church of Scientology*, 484 U.S. at 15, 108 S.Ct. at 275, and allow disclosure of select "information for miscellaneous administrative and other purposes," S.Rep. No. 938, pt. II, 94th Cong., 2d Sess. 480 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 4030, 4185. Subsection (m)(1) provides:

> The Secretary may disclose taxpayer identity information to the press and other media for purposes of notifying persons entitled to tax refunds when the Secretary, after reasonable effort and lapse of time, has been unable to locate such persons.

26 U.S.C. § 6103(m)(1). "Taxpayer identity" is defined for the purpose of this section as

> [T]he name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number ... or any combination thereof.

26 U.S.C. § 6103(b)(6).

■ Even if subsection (m)(1) applies in this case, that exception has no application to *the amount of refund due* a taxpayer and the applicable tax year, which are "re-

turn information" but not included in "taxpayer identity." Consequently, the general prohibition of § 6103(a) applies to the dollar amount of the refund due an individual taxpayer and the tax year involved and the IRS *may not* disclose this information. Thus, the IRS is entitled to summary judgment with respect to the disclosure of the refund amount due an individual and the particular tax year.[6]

1.  *Section 6103 as an Exempting Statute*

Both parties recognize that § 6103(m)(1) gives the Secretary discretion with respect to disclosure of taxpayer information in the case of unclaimed refunds. Each party uses this as the basis for a specious argument in support of its respective position.

■ Aronson argues that because § 6103 makes the decision to disclose taxpayer identity information a matter subject to the Secretary's discretion, it is "inescapable" that FOIA Exemption 3 "is inapplicable in the instant case." Plaintiff's Brief In Opposition to Defendant's Motion for Summary Judgment, docket no. 24, at 5. But neither the wording of § 552(b)(3) itself, nor the legislative history, support Aronson's claim that Exemption 3 "applies only ... to matters that are exempt by some other statute that has no discretionary authority in it." *Id.*

When Congress in 1976 amended the requirements of FOIA Exemption 3, it did so specifically to reduce agency discretion to withhold information.[7] Subsections (A) and (B) of § 552(b)(3) were designed to exclude "those broadranging statutes that give an agency '*carte blanche* [sic] to withhold any information [it] pleases.'" *CNA Fin. Corp. v. Donovan*, 830 F.2d at 1137 (quoting H.R.Rep. No. 880, pt. I, 94th Cong., 2d Sess. 23 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 2183, 2205). "Con-

gress, did not, however, enact a provision that excluded from the operation of Exemption 3 all statutes that left an agency with discretion over the disclosure of information; it merely required that this discretion be limited to certain defined matters or that it be informed by established criteria." *Chamberlain v. Kurtz*, 589 F.2d 827, 839 (5th Cir.), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).

Furthermore, it is clear from the plain language of the statute itself, and it has been confirmed in a number of cases, *see, e.g.*, *DeSalvo v. IRS*, 861 F.2d at 1221 n. 4; *Long v. United States IRS*, 742 F.2d 1173, 1178 (9th Cir.1984), that the provisions of Exception 3 are *alternatives*. The consequence of the fact that § 6103 contains discretionary provisions is that the court must determine whether the statutory exemption in question is "sufficiently specific to satisfy the requirements of Exemption 3." *Chamberlain v. Kurtz*, 589 F.2d at 838. Subsection 6103(m)(1) refers in particular to a specific type of information to be withheld or disclosed—taxpayer identification—and arguably also establishes criteria for making that determination. However, "Part B of Exemption 3 requires only that a statute either establish particular criteria or refer to particular types of matters." *Id.* at 839. Subsection (m)(1) clearly does the latter.

■ The IRS, on the other hand, declares simply that the (m)(1) "exception vests complete discretion in the Secretary of the Treasury," Reply of the United States, docket no. 25, at 2; *see also* Mem. of Points and Auth. in Support of United States, docket no. 17, at 4. Apparently the IRS is under the impression that this is the end of the matter: if the Secretary chooses not to exercise his "complete" discretion to disclose the information to Aronson, then the blanket prohibition is still effective and FOIA is irrelevant.

---

6. It is not clear that Aronson specifically requests itemization as to the precise tax year(s) for which the individual was due a refund(s). I will assume, for the purposes of this Memorandum and Order, that he does.

7. Overruling *FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). *See* H.R.Rep. No. 880, pt. I, 94th Cong., 2d Sess. 22–23 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News 2183, 2203–05; H.R.Conf.Rep. No. 1441, 94th Cong., 2d Sess. 25 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 2244, 2260–61.

More discriminating analysis of the decision to deny Aronson's request is called for, regardless of the discretion built into 6103(m)(1). *See Long,* 742 F.2d at 1181 ("It is totally inconceivable that Congress, on the one hand, would seek to limit discretion by requiring that it be exercised according to particular criteria spelled out in the statute and, on the other hand, would render its exercise completely unreviewable, even where it had been clearly abused."). The IRS does not deny that this suit is governed by FOIA, and has not argued that § 6103 is an independent basis for nondisclosure. Treating § 6103 of the I.R.C. as "merely an exempting statute that furnishes the substantive criteria for disclosure" under Exemption 3, and not a statute which preempts FOIA, entails that judicial review of an agency decision to withhold information not be merely deferential. *DeSalvo v. IRS,* 861 F.2d 1217, 1218–19 (10th Cir.1988); *see also Church of Scientology v. IRS,* 792 F.2d 146, 148–50 (D.C.Cir.1986), *en banc review on different grounds,* 792 F.2d 153 (D.C.Cir.1986), *aff'd,* 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987); *Grasso v. IRS,* 785 F.2d 70, 73–74 (3d Cir.1986); *Long v. United States IRS,* 742 F.2d 1173, 1177–78 & n. 12 (9th Cir.1984); *Linsteadt v. IRS,* 729 F.2d 998, 999 (5th Cir.1984); *Currie v. IRS,* 704 F.2d 523, 526–27 (11th Cir.1983). *But see King v. IRS,* 688 F.2d 488, 495 (7th Cir.1982) (release of return information governed exclusively by § 6103, not FOIA); *Zale Corp. v. United States IRS,* 481 F.Supp. 486, 489 (D.D.C.1979) (§ 6103 supersedes and acts independently of FOIA).

The FOIA requires a de novo review by this court to determine whether the IRS's withholding of the requested information is proper under the exemption claimed. 5 U.S.C. § 552(a)(4)(B); *see United States Dept. of Justice v. Reporters Committee for Freedom of Press,* 489 U.S. 749, 755, 109 S.Ct. 1468, 1472, 103 L.Ed.2d 774 (1989) (contrasting review under FOIA with usual discretionary review of agency action); *DeSalvo v. IRS,* 861 F.2d at 1221 (when validity of withholding under § 6103 is in dispute, FOIA requires de novo review of that decision). In this regard, the withholding agency bears the burden of justifying nondisclosure. 5 U.S.C. § 552(a)(4)(B); *Reporters Committee,* 489 U.S. at 755, 109 S.Ct. at 1472; *Irons v. FBI,* 880 F.2d 1446, 1458 (1st Cir.1989) (Selya, J., concurring in part and dissenting in part). Put simply, the IRS must show that it denied Aronson's request properly on the basis of § 6103(a)—notwithstanding § 6103(m)(1). While the interpretation of subsection (m)(1) in conjunction with the FOIA presents some difficulty, I conclude that the IRS has not met its burden even after being given an opportunity to supplement its original submissions.

2. *Application of Section 6103—Information Previously Disclosed to Others*

I.R.C. § 6103 was extensively revised by the Tax Reform Act of 1976. Pub.L. No. 94–455, 90 Stat. 1520. "One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS]." *Church of Scientology,* 484 U.S. at 16, 108 S.Ct. at 275; *see* S.Rep. No. 938, pt. I, 94th Cong., 2d Sess., 318 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 3439, 3747. Congress was concerned not only with protecting the privacy of citizens in general, but, specifically—as to information gathered for tax purposes—with the effect which abuse of such information would have on public confidence in the confidentiality of tax information and on the self-reporting income tax system. *See* H.R.Rep. No. 1380, 94th Cong., 2d Sess. 317 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 3356, 3747. Nonetheless, Congress continued to allow disclosure of particular information in certain situations for miscellaneous administrative and other purposes. S.Rep. No. 938, pt. II, 94th Cong., 2d Sess. 480 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 4030, 4185.

It is apparent that Congress, by specifically providing for disclosure of tax identity information concerning unclaimed refunds, concluded that the public interest in assuring that taxpayers get the refunds due them outweighs, in certain circum-

stances, the privacy interests counselling that tax identity information generally be kept confidential. *See* H.R.Rep. No. 1380, 94th Cong., 2d Sess. 340 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 3356, 3770 ("the reasons for the limited disclosures involved outweigh[ ] any possible invasion of the taxpayer's privacy which might result"). *Cf. Aronson v. U.S. Dept. of HUD*, 822 F.2d 182, 187–88 (1st Cir.1987) [hereinafter *"Aronson I"*] (after HUD is no longer actively searching for unpaid distributive share recipients, public interest in seeing they are paid outweighs any invasion of privacy caused by release of information concerning them), *later proceeding*, 866 F.2d 1 (1st Cir.1989) [hereinafter *"Aronson II"*], *connected case*, 869 F.2d 646 (1st Cir.1989), *on remand*, No. 88–1188–S, slip op. (D.Mass. April 29, 1991) [hereinafter *"Aronson IV"*]. This congressional decision is no more subject to re-evaluation by the IRS than it is by this court. Indeed, Exemption 3 was redesigned with its present provisions "to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." *American Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir.1978).

In support of its initial motion for summary judgment, the IRS claimed that subsection (m)(1) prohibited disclosure of taxpayer identity information to Aronson, because he "has made no showing that he is a member of the press or of other media." Although Aronson does not make claims to being a journalist, he is a professional "tracer" and on this basis, he argues, that he is a representative of "the press and other media" for purposes of subsection (m)(1). Aronson points out that the dictionary definition of "media" includes "something serving as a means of transmission of communication." *New Webster Encyclopedic Dictionary of the English Language* 525 (7th ed.1971).

While I am not wholly persuaded by Aronson's semantic argument, there are several reasons to give the phrase, "the press and other media," a broad reading in the context of § 6103 as incorporated by Exemption 3. First, within the context of FOIA, doubts should be resolved in favor of disclosure: exemptions to FOIA are to be narrowly construed. *See United States Dept. of Justice v. Julian*, 486 U.S. 1, 8, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988). To serve the same end, exceptions to exemptions must be read broadly. Second, absent a privileged relationship, disclosure to some requesters and not others is in conflict with the FOIA. It is well established that, except in cases involving personal privilege, "the identity of the requesting party has no bearing on the merits of his or her FOIA request." *Reporters Committee*, 489 U.S. at 771, 109 S.Ct. at 1480; *see also FBI v. Abramson*, 456 U.S. at 631, 102 S.Ct. at 2064 ("Congress did not differentiate between the purposes for which information was requested."); *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C.Cir.1989) [hereinafter *"NARFE"*] (under FOIA "information available to anyone is available to everyone"), *cert. denied*, —— U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936, (1990); *Aronson I*, 822 F.2d at 185–86 (commercial motivations of requester irrelevant: "Congress granted the scholar and the scoundrel equal rights of access to agency records." (quoting *Durns v. Bureau of Prisons*, 804 F.2d 701, 706 (D.C.Cir.1986))). Third, contrary to the claims of the IRS, reading "other media" broadly would not make the exception "a nullity." In fact, it is plausible to conclude that the subsection directs disclosure to the "press and other media" as representatives of the public at large and to indicate that the information is not to be selectively disclosed, but broadly disseminated.[8]

---

**8.** Comparison with other exceptions allowing the disclosure of tax identity information is instructive. *See* § 6103(m)(2)–(6). With one exception (disclosure to lenders in case of default on student loans), all other disclosures are to federal and state agencies for limited use, and safeguards prevent further dissemination. (In

this context the House Report states "[a]ddress information will not, however, be provided to commercial concerns." H.R.Rep. No. 1380, 94th Cong., 2d Sess. 340 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 3356, 3769.) These other exceptions, which deal with matters unrelated to taxation (e.g. notifying

Most importantly, because there is little in the way of legislative history for guidance, and the phrase "press and other media" is not defined or discussed elsewhere, the obvious purpose of subsection (m)(1) should be considered in construing the phrase.[9] The purpose in creating the exception, and the purpose of the disclosure itself, is to help refund the tax credit while minimizing the invasion of privacy. Because the Congressional purpose is clear, the goal of the disclosure should be the primary consideration informing any interpretation of the phrase "press and other media": to whom should be determined in light of why.

The IRS has submitted evidence that a significant part of its effort to return un-

claimed refunds is its Undelivered Refund Checks Program. The major objectives of this program include wide dissemination, through a multi-media approach, of lists containing the name of the taxpayers entitled to undelivered refunds along with his or her city, state, and zip code. *See IR Manual,* 6326.1:(1)–(3) (1–14–91); Fadely Declaration, ¶¶ 6–7. In light of this disclosure, I conclude that the refusal of the IRS to release the same information to Aronson is unjustified under Exemption 3 of the FOIA.[10] Aronson simply proposes to use his own techniques in a manner which would also serve the purposes of the IRS program. The unrestricted release of such information to parties the Secretary deems qualified as legitimate "members of the press or other media," [11] while refusing

---

those exposed to occupational hazards), concern only the disclosure of address information for the purpose of locating the individual.

Disclosure under (m)(1) would involve identification of the individual as someone due a tax refund. (Such information would be of particular interest for direct mail targeting by a business concern such as a tax preparer.) Furthermore, once disclosure is made to the press the use of the information is totally uncontrolled.

**9.** The IRS cites *National Sec. Archive v. U.S. Dept. of Defense,* 880 F.2d 1381, 1385–87 (D.C. Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990), as "extremely instructive" on the question of who qualifies as "media." That case, however, considered the definition of "representative of the news media" under provisions of FOIA requiring *reduced fees* for searches and copies of records. *See* 5 U.S.C. § 552(a)(4)(A)(ii). The legislative history concerning fee waivers indicates that the phrase "representative of the news media" is to be broadly interpreted to include any person or organization "that is in the business of publishing or otherwise disseminating information to the public," *National Sec. Archive,* 880 F.2d at 1386 (quoting 132 Cong.Rec. H9463 (Oct. 8, 1986) (Reps. English and Kindness)); *see also* 132 Cong.Rec. S14298 (daily ed. Sept. 30, 1986) (Sen. Leahy). Nonetheless, Congress expressly provided that fee waivers are not available when record requests are sought "primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Congress was concerned in framing the provisions for reduced fees that "information vendors, data brokers, and other second-hand disseminators of documents who do so at a price as the means of their economic self-sufficiency, should not qualify ... under any reasonable construction of the term 'media'" 880 F.2d at 1387 (quoting 132 Cong.Rec. S16,505 (Oct. 15, 1986) (Sen. Hatch)).

No such limitation is either explicit or implicit in § 6103(m)(1).

**10.** The fact that the names, city, state and zip codes of these individuals may have previously been published does not exempt this information from subsequent FOIA disclosure. *See United States Dept. of Justice v. Tax Analysts,* 492 U.S. 136, 152, 109 S.Ct. 2841, 2852, 106 L.Ed.2d 112 (1989).

**11.** The IRS submissions reveal that the Secretary's authority to disclose taxpayer identity information, pursuant to § 6103(m)(1), for the purpose of notifying persons entitled to unclaimed refunds has been widely delegated since this suit was commenced. *See* Delegation Order No. 156 (Rev. 11), ¶ 8 (effective Sept. 27, 1989), *reprinted in* Hdbk. of Delegation Orders (*IR Manual,* 1229); *see also* Delegation Order No. 156 (Rev. 12), ¶ 8, *reprinted in* 55 Fed.Reg. 27,743, 27,747 (July 5, 1990).

Furthermore, various reports submitted from regional offices of the IRS indicate that, due to IRS efforts, lists of those due refunds were widely distributed and published. *See, e.g.,* IRS Memorandum from Regional Public Affairs Officer, Mid–Atlantic Region, attached narrative (Feb. 2, 1987) (Fadely Declaration, Ex. 6a) (Baltimore Sun in 1986 ran complete list in approximately 500 column inches); IRS Memorandum from Asst. Regional Commissioner, Central Region, attached narrative (May 31, 1988) (Fadely Declaration, Ex. 6c) (portions of list of over 600 names were printed in 32 newspapers in the Cleveland area; two Detroit papers printed complete statewide list sorted by city; Louisville paper ran complete list; twelve daily and eight weekly papers ran list issued by Parkersburg); Southwest Region Public Affairs and Taxpayer Information Narrative (second reporting period, 1988) (Fadely Declaration, Ex. 6f) (thirteen

release under the FOIA to Aronson, a party whose interest was judged too commercial, is an abuse of the discretion granted the Secretary under § 6103.

### 3. *Application of Section 6103—Information Not Previously Disclosed to Others*

The records requested by Aronson include not only information previously disclosed by the Secretary, but also information the Secretary has not previously released. Some of this additional information is plainly within the scope of the statutory exception to the general rule of confidentiality. The provisions of § 6103 define "taxpayer identity" information, which the Secretary may disclose under § 6103(m)(1), as including the taxpayer's "mailing address [and] his taxpayer identifying number." § 6103(b)(6). Under the de novo review appropriate here, I must decide, based on the information before me, whether access to this additional information was validly denied to Aronson given the criteria established by the statute. *See* 5 U.S.C. § 552(a)(4)(B); *DeSalvo*, 861 F.2d at 1221 (citing *Grasso*, 785 F.2d at 73; *Long*, 742 F.2d at 1178 n. 12; *Linsteadt*, 729 F.2d at 999).

The text of subsection (m)(1) indicates that the response of the IRS to the request made by Aronson should reflect other distinct considerations: which taxpayer identity information should be released and when it should be released. The statute provides criteria for each. Information should be released which significantly advances the "purpose[ ] of notifying persons entitled to tax refunds," and "when the Secretary, after reasonable effort and lapse of time, has been unable to locate such persons." 26 U.S.C. § 6103(m)(1). Given the Congressional purpose in permitting the Secretary to breach confidentiality by disclosing taxpayer identification information, the decision to withhold other taxpayer identification information which would be useful in identifying and locating those due refunds (last known mailing address and taxpayer

identifying number) should be evaluated in terms of the threat to privacy posed by further disclosure and the extent to which the IRS continues to make an effective effort to locate these individuals. This evaluation is no different than that balancing of the conflicting interests in privacy and disclosure which I must consider with respect to FOIA Exemption 6. Accordingly, I turn now directly to Exemption 6.

### B. EXEMPTION 6 AND PRIVACY

FOIA Exemption 6 excuses from disclosure information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Application of this provision involves a two-part inquiry, considering both the nature of the files and the warrant for the disclosure. *See United States Dept. of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982). It is undisputed that the records at issue here, derived from tax returns, qualify as "similar files" within the scope of Exemption 6. Thus, I move to the second part of the test: whether disclosure would constitute a "clearly unwarranted" invasion of personal privacy. *Id.*

In *Dept. of the Air Force v. Rose*, the Supreme Court established that the question of the warrant for the disclosure is determined by balancing the individual's right to privacy against "the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' " 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976); *see also Hopkins v. United States Dept. of HUD*, 929 F.2d 81, 86 (2d Cir.1991) ("whether documents are protected under the FOIA privacy exemptions turns on whether the privacy interest in nondisclosure of the documents outweighs the public interest in their release."). Accordingly, the balancing process requires identifying (1) the privacy interest at stake and (2) the public interest in disclosure. *See Wine Hobby USA, Inc. v. United States IRS*, 502 F.2d 133, 136–37 (3d Cir.1974). I will con-

Phoenix papers printed names; nine Wichita area dailies and 21 weeklies ran lists).

sider separately the privacy interests raised by a taxpayer's identifying number—which for an individual is that person's Social Security number [12]—and a taxpayer's complete mailing address.

### 1. *The Privacy Interests*
#### a. Social Security Numbers

■ Aronson suggests that, based on that pervasive use of Social Security numbers in a wide variety of contexts, the privacy interests associated with their release are minimal. He asks this court to

> take judicial notice of the fact that credit reporting agencies such as Equifax Credit Information, TRW, Dun & Bradstreet Credit Services have in their data bases the Social Security numbers of more than 160,000,000 people and that data relating to these people can only be accessed by reference to the Social Security number....

Contrary to Aronson's intent, such facts, if noticed, would go to show that taxpayers have a very strong privacy interest in their Social Security numbers. *See I.B.E.W. Local Union No. 5 v. United States Dept. of HUD,* 852 F.2d 87, 89 (3d Cir.1988) (potential misuse a basis for employees' strong privacy interest in their Social Security numbers). The very fact that a wealth of personal information about an individual becomes accessible by obtaining the individual's Social Security number is precisely why knowledge of that otherwise narrowly applicable number threatens privacy. The Congressional concern to protect this interest is evident by the independent statutory prohibition against the denial of any right, benefit, or privilege by a government agency because of an individual's refusal to disclose his Social Security number. Privacy Act of 1974, Pub.L. No. 93–579, § 7, 88 Stat. 1896, 1909, *reprinted in* 5 U.S.C.S. § 552a note at 448 (Law.Co-op.1982); *see also Yeager v. Hackensack Water Co.,* 615 F.Supp. 1087, 1091 (D.N.J.1985) ("Privacy Act was designed to discourage improper uses of Social Security numbers").[13] The report of the Senate Committee supporting adoption of this provision suggests that the extensive use of Social Security numbers as universal identifiers in both the public and private sectors is "one of the most serious manifestations of privacy concerns in the Nation." S.Rep. No. 1183, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 6916, 6943.

While access to Social Security numbers would likely assist in locating individuals due refunds, it would do so precisely because it would provide linkage to the vast amount of personal information already in data banks. The serious threat to privacy posed by such easily accessible computerized data banks is well recognized. *See Whalen v. Roe,* 429 U.S. 589, 605, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977); *id.* at 607, 97 S.Ct. at 880 (Brennan, J., concurring). Because of the capacity of this information to unlock a wide variety of private data and the potential for abuse, public disclosure by the IRS of an individual's Social Security number would not be warranted in this context.

#### b. Mailing Addresses

■ "The importance of the right to privacy in one's address is evidenced by the acceptance within society of unlisted telephone numbers, by which subscribers may avoid publication of an address in the public directory, and postal boxes, which permit the receipt of mail without disclosing

---

**12.** As specified by I.R.C. § 6109, the taxpayer identifying number used for an individual (or his estate) is that person's Social Security number. In conformity with the labeling of data "fields" in the IRS Record Layout Chart, I treat "taxpayer identifying number" and "Social Security number" as interchangeable for the purposes of this Memorandum and Order.

**13.** Although it has not been raised by the IRS, release of an individual's Social Security number might run afoul of § 7 of the Privacy Act of 1974, Pub.L. No. 93–579, § 7, 88 Stat. 1896, 1909, which provides in pertinent part:

> (b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual ... what uses will be made of it.

5 U.S.C.S. § 552a note at 448 (Law.Co-op.1982). The record does not disclose whether the IRS has given notice to taxpayers that their Social Security numbers might be provided to those performing refund search services.

the location of one's residence." *Heights Community Congress v. Veterans Admin.*, 732 F.2d 526, 529 (6th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 398 (1984). A growing number of cases agree that disclosure of a person's address, at least in most contexts, significantly implicates personal privacy interests. *See, e.g., Hopkins v. HUD*, 929 F.2d 81, 87 (2d Cir.1991) (individuals have a significant privacy interest in avoiding disclosure of their names and addresses); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C.Cir. 1991) ("privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address is significant" (quoting *NARFE*, 879 F.2d at 875)); *I.B.E.W. Local Union No. 5 v. HUD*, 852 F.2d 87, 89 (3d Cir.1988) ("individuals have some privacy interest in their home addresses" (quoting *United States Dept. of Navy v. Federal Labor Relations Auth.*, 840 F.2d 1131, 1136 (3d Cir.1988))); *USDA v. Federal Labor Relations Auth.*, 836 F.2d 1139, 1143 (8th Cir.1988) (some individuals have particular privacy interests in home addresses), *vacated and remanded on other grounds*, 488 U.S. 1025, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989); *Aronson I*, 822 F.2d 182, 186 (1st Cir.1987) (privacy interests especially significant when names and addresses are combined with financial information); *Minnis v. USDA*, 737 F.2d 784, 787 (9th Cir. 1984) (disclosure of name and address list would implicate more than minimal privacy interest), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *A.F. G.E., Local 1923 v. United States Dept. of Health & Human Servs.*, 712 F.2d 931, 932 (4th Cir.1983) ("employees have a strong privacy interest in their home addresses"); *Wine Hobby*, 502 F.2d at 136–37 (3d Cir. 1974). *But see United States Dept. of Air Force v. Federal Labor Relations Auth.*, 838 F.2d 229, 232 (7th Cir.) (privacy interest

in home addresses is generally minuscule), *cert. dismissed*, 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); *A.F.G.E., Local 1760 v. Federal Labor Relations Auth.*, 786 F.2d 554, 556–57 (2d Cir.1986) (privacy interest of average employee in home address is not compelling); *Getman v. NLRB*, 450 F.2d 670, 674–75 (D.C.Cir.1971) (disclosure of bare names and addresses involves only a minor invasion of privacy); *Developments Under the Freedom of Information Act—1988*, 1989 Duke L.J. 686, 711 (suggesting courts have found little privacy interest in an individual's name and address).[14]

Even recognizing that the privacy interest in one's address may be significant, however, the particular circumstances under consideration make it somewhat less so here. Whereas individuals generally "have a significant privacy interest in avoiding disclosure of their names and addresses, particularly where ... the names and addresses would be coupled with personal financial information," *Hopkins*, 929 F.2d at 87 (citations omitted); *accord Aronson I*, 822 F.2d at 186 (privacy interest more significant when names and addresses are combined with financial information), in this case many of the individuals have already been publicly identified, by name, city, state and zip code, as persons due an outstanding tax refund. Thus the impact of the disclosure of the records requested is notably diminished.

The Supreme Court has recently emphasized the fact that there can be a "privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public." *Reporters Committee*, 489 U.S. at 767, 109 S.Ct. at 1478. However, in the instant case we are not dealing with either previously

---

**14.** Indeed, one judge has suggested that "[m]ost circuits have concluded that privacy interests in names and addresses *alone* are 'not particularly compelling.'" *Federal Labor Relations Auth. v. United States Dept. of Treasury, Fin. Mgt. Serv.*, 884 F.2d 1446, 1459 (D.C.Cir.1989) (R. Ginsburg, J., concurring) (emphasis added) (citing, among others, *A.F.G.E., Local 1760 v. Federal Labor Relations Auth.*, 786 F.2d at 556), *cert. denied*, —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d

948 (1990). However, the question of whether an individual has a privacy interest in his or her *bare* address does not fully frame the issue. The more meaningful question is whether inclusion of the address in the context of the particular requested record raises significant privacy concerns, for example because the inclusion of the address can invite unsolicited contact or intrusion based on the additional revealed information.

"scattered disclosure of bits of information," or restricted dissemination. *Cf.* 489 U.S. at 763–67, 109 S.Ct. at 1476–78. On the contrary, the lists involved were already distributed to and reproduced in numerous publications with wide circulations in the taxpayers' locale for the purpose of public notification; often with the individuals grouped by zip code and then alphabetized.

The important remaining issue concerns whether or not the addition of a street address [15] to the previously released information significantly increases the threat to privacy interests. As was noted in *Air Force v. Federal Labor Relations Auth.*, most home addresses can be found in the telephone book. 838 F.2d at 232. Furthermore, under the circumstances in question, the address is unlikely to be current: an "undeliverable refund notice" sent to that address having failed to elicit a reply from the taxpayer. Thus the address is unlikely to be immediately and directly useful for contacting the taxpayer, *cf. Aronson I*, 822 F.2d at 185 (suggesting that privacy interests in "stale" information might be less than more recent data), although that address may ultimately prove instrumental to the success of the exceptionally diligent in locating and eventually contacting the individual. It is this usefulness to the diligent which poses whatever limited threat of intrusion is implicated here.

In a different context, the Supreme Court has acknowledged that "the right of every person 'to be let alone'" involves "a sufficient measure of individual autonomy ... to permit every householder to exercise control over unwanted mail." *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d

736 (1970). It has also been recognized that commercial solicitations a person may receive as a result of the release of his or her name and address can result in more than a *de minimis* invasion of personal privacy. *NARFE*, 879 F.2d at 876; *accord Minnis v. USDA*, 737 F.2d at 787; *Retired Officers Ass'n v. Department of Navy*, 744 F.Supp. 1, 2 (D.D.C.1990). *See generally* Smith, *We've Got Your Number! (Is it Constitutional to Give it Out?)*, 37 UCLA L.Rev. 145, 178–93 (1989) (informational privacy right protects against disclosures that could lead to harassing contacts, particularly those involving intrusion into the home). *But see Air Force v. Federal Labor Relations Auth.*, 838 F.2d at 232 (unsolicited mailing is insignificant because "the addressee may send it to the circular file"). Thus, although modest, the intrusion invited by the disclosure of a taxpayer's complete mailing address is sufficient to trigger Exemption 6 balancing.

### 2. *The Public Interest*

Turning to the second element of the privacy balancing test—consideration of the public interest served by disclosure of the requested material—I note at the outset the First Circuit has observed that "[t]he public interest is manifestly served by the disclosure and consequent disbursement of funds the government owes its citizens." *Aronson I*, 822 F.2d at 185.

The IRS contends, however, that reliance on this sort of public interest to overcome an infringement of personal privacy cannot survive the recent Supreme Court decision in *Reporters Committee*. *Reporters Committee* suggests that for purposes of FOIA, the public interest in disclosure of a

---

**15.** Although I refer here to the "street address" in conformity with the labeling of data "fields" in the IRS Record Layout Chart, it is worth noting that what is in question is that information, in addition to the taxpayer's city, state and zip code, which is required to complete the *mailing* address, *cf.* I.R.C. § 6103(b)(6) (defining "taxpayer identity" as including the "mailing address" of the person with respect to whom a return is filed). Although perhaps exceptional, the address used on the return need not necessarily be the taxpayer's home address or residence. *See* IRS Form 1040A and Instructions

(1989) (instructions for block labeled "home address" on Form 1040A state: "If your post office does not deliver mail to your home and you have a P.O. box, show your P.O. box number instead of your home address."); *cf.* 55 Fed.Reg. 41,200, 41,202 (Oct. 10, 1990) (Dept. of Health & Human Serv.) (to be codified at 20 C.F.R. Part 401) (construing "mailing address" for purposes of the Blood Donor Locator Service, *see* I.R.C. § 6103(m)(6), as residence *or* post office box). Thus, the taxpayer is free to take steps to shield his or her home address from disclosure under § 6103 or FOIA.

requested document must be measured in terms of the relationship of that document to FOIA's central purpose, i.e., "to open agency action to the light of public scrutiny." *See* 489 U.S. at 772, 109 S.Ct. at 1481 (quoting *Rose*, 425 U.S. at 372, 96 S.Ct. at 1604). In *Reporters Committee* the Court denied the press access under FOIA to an FBI rapsheet because of the privacy interests of the subject of the report. Although the Court was applying a different FOIA exemption, central to its analysis was consideration of the purpose of FOIA and the fact that this purpose "is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." 489 U.S. at 773, 109 S.Ct. at 1481.[16] The opinion suggests that if the nature of the request (the type of information sought) is unrelated to the basic purpose of FOIA, then countervailing interests, such as privacy, will outweigh the (non-FOIA-related) public interest in disclosure.[17]

The information sought by Aronson is related to the basic purpose of FOIA. In *Aronson I*, which considered Mr. Aronson's request under FOIA for a list of mortgagors entitled to refunds from HUD for insurance premiums, the First Circuit stated that "[t]he public interest in the release of the information, and in the attendant correction of the problem of non-disbursement, is consistent with FOIA's goals of the exposure of agency action to public inspection and oversight." 822 F.2d at 185 (citing *Rose*, 425 U.S. at 360–61, 96 S.Ct. at 1598–99). In determining that disclosure of the list of individuals entitled to distributive shares from HUD was required by FOIA, the *Aronson I* court emphasized the disbursal of the funds as the public interest in disclosure, but also weighed "the revelation and consequent correction of an inability of HUD to disburse funds to their rightful owners." *Aronson I*, 822 F.2d at 188.[18] As the First Circuit noted in *Aronson II*, "the failure of HUD to comply reasonably with its reimbursement duty would probably only be disclosed by someone with a

**16.** Although *Reporters Committee* concerned the special privacy exemption for law enforcement records, Exemption 7(C), the D.C. Circuit had no difficulty extending its analysis to Exemption 6. *Federal Labor Relations Auth. v. Treasury*, 884 F.2d at 1451. Thus, *Reporters Committee* can be read to suggest that "once a privacy interest, however modest, is implicated, the Act forbids disclosure of information that advances a significant public interest ... if that interest is unrelated to FOIA's 'core purpose.'" 884 F.2d at 1459 (R. Ginsburg, J., concurring).

**17.** This reading of *Reporters Committee*, as the D.C. Circuit has noted, is not the only one available. The language in *Reporters Committee*

does not necessarily mean that there is no exception to the general rule that the public interest in disclosure under FOIA should be defined exclusively in terms of finding out what the "government is up to." Nothing in the passage suggests that the Court had considered and rejected the relevance of public interest objectives identified by Congress in other disclosure statutes.

*Federal Labor Relations Auth. v. Treasury*, 884 F.2d at 1453. Such an alternative interpretation of *Reporters Committee* leaves intact a number of FOIA decisions of other courts which have based disclosure on other public interests acknowledged in other federal statutes (e.g., the Labor–Management Relations Act, *see generally* Note, *Applying the Freedom of Information Act's*

*Privacy Exemption to Requests for Lists of Names and Addresses*, 58 Fordham L.Rev. 1033, 1048 n. 92 (1990) (citing cases)). Furthermore, it is consistent with *Aronson I* and *Aronson II* where the identified public interest in the government's return of monies owed mortgagors is also grounded upon a *statutory* mandate. *See* 822 F.2d at 183 (citing 12 U.S.C. § 1711(c)); *see also* 866 F.2d at 2–3. As noted in section II.A.2, above, I.R.C. § 6103(m)(1) is just such a congressional (non-FOIA) disclosure authorization, which not only identifies other relevant public interests in disclosure but also takes into account the countervailing privacy interests.

**18.** The reading given *Reporters Committee* by some other Circuits, however, assigns less weight to this type of public interest in the balance the FOIA has struck to protect against an unwarranted infringement of privacy. *See, e.g., NARFE*, 879 F.2d at 879 (under *Reporters Committee*, "unless the public would learn something *directly* about the workings of the Government by knowing the names and addresses ... their disclosure is not affected with the public interest" when it comes to balancing against privacy concerns. (emphasis changed)); *Hopkins*, 929 F.2d at 88 ("disclosure of information affecting privacy interests is permissible only if the information reveals something *directly* about the character of a government agency or official" and not on the basis of its merely attenuated relationship to governmental activity).

specific interest in ferreting out unpaid recipients." 866 F.2d at 3. Furthermore, the Court of Appeals confirmed that Aronson's commercial motivations were irrelevant to the question of public interest. 822 F.2d at 188.[19]

Similarly, I conclude that there is a significant public interest in disclosure concerning those individuals whose tax refunds remain undelivered: these materials would be useful, if not essential, to someone evaluating the efforts of the IRS to locate those owed the refunds. Such monitoring of an agency's practices "is exactly the kind of public interest Congress intended FOIA to facilitate." *I.B.E.W. Local Union No. 5 v. HUD*, 852 F.2d at 91. Disclosure is necessary to fulfill the purpose of FOIA, which was designed to eliminate the practice by some agencies of withholding information to "cover up embarrassing mistakes or irregularities," S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965), *quoted in Washington Post Co. v. U.S. Dept. of Health & Human Services*, 690 F.2d 252, 264 (D.C.Cir.1982). Indeed, Congress has quite recently directed its oversight attentions to the performance of the IRS in distributing refunds to taxpayers. *See generally* U.S.Gen. Acc't Office, *Unclaimed Money* (May, 1989).

My own experience in the course of this litigation has demonstrated how difficult it is to evaluate the nature and effectiveness of agency action based on the agency's incomplete narrative representations and the release of "raw" statistical data. Moreover, even the clearest presentation of the IRS procedures and complete statistics on the numbers of checks remaining undelivered at every stage, would not reveal how easily or with how much difficulty the unrefunded taxpayer could be located by some other means. *See Aronson IV*, slip. op. at 5 ("Without the individual cases, the public cannot assess the ease or difficulty of locating these people and, concomitantly, the efficacy of HUD's efforts."). Disclo-

sure of the information requested may thus add significantly to the public's knowledge of and ability to oversee government operations.

### 3. *Setting The Balance*

The Supreme Court in *Reporters Committee* noted that "categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." 489 U.S. at 776, 109 S.Ct. at 1483. I find here no need to "linger over the balance," *NARFE*, 879 F.2d at 879, or dwell on individual circumstances with respect to the disclosure of Social Security numbers. The public benefit derivable from the additional disclosure of taxpayer Social Security numbers is negligible when compared to the significant privacy interest involved. Release of this information would clearly be an unwarranted invasion of privacy.

The mailing addresses present a more difficult question. Despite the privacy interests involved, in balancing the countervailing interests, I must recognize that FOIA entails a presumption in favor of disclosure, *see Rose*, 425 U.S. at 360–62, 96 S.Ct. at 1598–1600, that "Exemption 6 applies only to invasions of privacy that are '*clearly* unwarranted,' ... that the burden is on the government to prove that its withholding of information was justified under this standard," *Aronson I*, 822 F.2d at 187 (citing 5 U.S.C. § 552(a)(4)(B)), and that there is a significant public interest in disclosing addresses once the IRS has failed for three years to locate the taxpayer entitled to a refund.

The records requested by Aronson pertain to refunds that are now long overdue. The most recent of the checks in question have remained undelivered for not less than three years. As the First Circuit noted in *Aronson I*, "[w]ith the passage of time, it becomes less and less 'clear' that

---

**19.** The IRS attempts to distinguish the *Aronson v. HUD* cases from the instant one on the ground that, unlike the mortgagors, taxpayers are aware of their right to a refund because they filed a return. However, even if it were true

that the HUD mortgagors were not initially aware of their "windfall entitlement," it is unclear how this distinction has any bearing on evaluating the public interest served by disclosure of the respective lists.

the disclosure of information is not 'warranted,' as those terms are used in FOIA Exemption 6." 822 F.2d at 188. Furthermore, I am guided by the suggestion in I.R.C. § 6103(m)(1) itself that disclosure should follow "when the Secretary, after reasonable effort and lapse of time, has been unable to locate" persons entitled to tax refunds. Given that the Secretary, acting under § 6103(m)(1), has already chosen to disclose taxpayer identity information to the press for the purpose of public notification, whatever infringement of privacy may be anticipated by the additional disclosure of complete mailing addresses (including, e.g., street addresses) will arise as a necessary consequence of the achievement of the very purpose of the disclosure itself—notification of the taxpayer.

Finally, I find the record sketchy as to the continued efforts by the IRS to return refunds which remain undelivered for some time. Passive attempts at notice, e.g., newspaper announcements and waiting for the person due a refund to file a return for a subsequent year or otherwise notify the IRS of his or her whereabouts, have been unsuccessful with respect to the refunds in question. Moreover, it is unclear how long these minimal procedures have been pursued or whether they are ongoing. Even construing the record in the light most favorable to the IRS, I am unable to find any indication that the IRS is actively seeking those entitled to undelivered refunds for the tax years in question (1981–87, inclusive). Based on these factors, I find that the balance of interests tips in favor of disclosure of complete mailing addresses.

### III

For the reasons set forth above, I hereby ALLOW summary judgment for Aronson with respect to disclosure of the records of the names and last known mailing addresses of those taxpayers still due refunds for the tax years 1981 through and including 1987. I ALLOW partial summary judgment for the IRS only with respect to the disclosure of taxpayers' Social Security numbers, the amounts of refunds due, and the tax year involved.

Pursuant to 5 U.S.C. § 552(a)(4)(B), the IRS is hereby ORDERED to produce, within 60 days, a copy of Tape File 714–32–11, or its equivalent with respect to those federal income tax refunds for the tax years 1981 through and including 1987 which remain undelivered, disclosing the information requested with respect to:

taxpayer's name(s) [field 8]

taxpayer's last known mailing address(es) [fields 5 (zip code), 7 (city, state) and 9 (street address)];

but only after having redacted the data indicating:

taxpayer's identifying (Social Security) number [field 1]

service center and district office codes [field 2]

tax period of credit balance [field 3]

amount of credit balance [field 4], and document locator number [field 6].

As provided by 5 U.S.C. § 552(a)(4)(A)(v), the IRS may require Aronson to pay the appropriate fees in advance of receipt, if it determines they will exceed $250.