988 F.2d 1344
 61 USLW 2585, Unempl.Ins.Rep. (CCH) P 17193A
 Marc Alan GREIDINGER, Plaintiff-Appellant,
v.
Bobby Ray DAVIS, Chairman; John H. Russ, Jr.,
Vice-Chairman; Michael G. Brown, Defendants-Appellees,
and
Ray H. Davis, General Registrar, Defendant.
Computer Professionals for Social Responsibility, Amicus Curiae.
 No. 92-1571.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1992.
Decided March 22, 1993.
 
 Paul Reinherz Wolfson, Public Citizen Litigation Group, Washington, DC, for plaintiff-appellant.
 Roger Conant Wiley, Jr., Sr. Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, argued (Mary Sue Terry, Atty. Gen. of Va., K. Marshall Cook, Deputy Atty. Gen., Martha B. Brissette, Asst. Atty. Gen., Office of the Attorney General, on the brief), for defendants-appellees.
 Marc Rotenberg, David L. Sobel, Computer Professionals for Social Responsibility, Washington, DC, for amicus curiae.
 Before RUSSELL and HAMILTON, Circuit Judges, and TRAXLER, United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 As a consequence of registering to vote in the Commonwealth of Virginia (Virginia), a registered voter's Social Security number (SSN) is subject to public inspection in the Office of the General Registrar and provided upon request to, among other entities, political parties as part of voter registration lists. Applying strict scrutiny, the district court held that these provisions of Virginia's voter registration scheme do not violate appellant's fundamental right to vote. Greidinger v. Davis, 782 F.Supp. 1106 (E.D.Va.1992). We now reverse.
 
 
 2
 * The Constitution of Virginia requires all citizens otherwise qualified to vote and possessing a SSN (registering after July 1, 1971) to provide their SSN on their Virginia Voter Registration Application (Application) in order to become registered to vote. Va. Const. art. II, § 2. If an individual otherwise qualified to vote does not possess a SSN, a "dummy" number will be provided. The scheme also provides that any registered voter may inspect the voter registration books in the Office of the General Registrar. In practice, these books contain the registration application of a registered voter. Va.Code Ann. § 24.1-56 (§ 24.1-56).
 
 
 3
 The scheme further provides that Statewide Voter Registration lists containing the SSNs of voters can be obtained by: (a) candidates for election to further their candidacy, (b) political party committees for political purposes only, (c) incumbent office holders to report to their constituents, and (d) nonprofit organizations which promote voter participation and registration for that purpose only. Va.Code Ann. § 24.1-23(8) (§ 24.1-23(8)).[1]
 
 
 4
 On July 24, 1991, appellant, Marc Alan Greidinger, filled out an Application, but refused to disclose his SSN. Because of this omission, Greidinger received a Denial of Application for Virginia Voter Registration from the General Registrar of Stafford County. Consequently, the Virginia State Board of Elections (the Board) prevented Greidinger from voting in the November 5, 1991, general election. The Application completed by Greidinger did not state whether disclosure of his SSN was mandatory or voluntary, by what statutory or other authority the SSN was requested, what uses would be made of the SSN, or that the SSN might be disseminated to registered voters or political parties.
 
 
 5
 On August 22, 1992, Greidinger instituted this action pro se against Robert H. Davis, Greidinger's local registrar,[2] Bobby W. Davis, John H. Russ, Jr., and Michael G. Brown, who collectively comprise the Board.[3] Greidinger sought preliminary and permanent injunctive relief, declaratory relief, writs of mandamus and prohibition, costs and attorney's fees. Greidinger alleged that to the extent Virginia authorizes the collection and publication of SSNs for voter registration, it unconstitutionally burdens his right to vote. Greidinger also alleged that Virginia's Voter Registration Application violates § 7(b) of the Privacy Act of 1974, Pub.L. No. 93-579, § 7, 88 Stat. 1896, 1909 (1974), reprinted in 5 U.S.C. § 552a note (1982) (Privacy Act of 1974 or Privacy Act), because it did not: (a) specify whether the disclosure of the SSN was mandatory or voluntary, (b) inform him by what statutory or other authority his SSN was solicited, and (c) specify what uses would be made of his SSN.
 
 
 6
 The parties filed cross-motions for summary judgment based upon stipulated facts. In pertinent part, the stipulation provided:
 
 
 7
 (1) Marc Alan Greidinger ("Greidinger") is a resident of Stafford County, Virginia, and is fully qualified to register to vote under the laws of the Commonwealth of Virginia.
 
 
 8
 ....
 
 
 9
 (6) The Virginia Voter Registration Application[ ] completed by Greidinger ... did not specify whether disclosure of the social security account number is mandatory or voluntary, by what statutory or other authority the number was requested, or what uses would be made of the number[ ], or the specific consequences of not providing the number[ ], or the possible dissemination of the number[ ], nor [was] Greidinger notified of these facts by the Defendants before [he] applied to register to vote ... Greidinger [did not] ask[ ] for any of this information at the time [he] applied to register to vote.
 
 
 10
 ....
 
 
 11
 (15) The Commonwealth of Virginia has an interest in obtaining and using social security numbers of registered voters to provide a means of positive identification and prevent voter fraud, and in making voter registration information available to the public. However, no state interest is served by disclosing the social security numbers of voters to private individuals who request voter information from local registrars in the Commonwealth of Virginia.
 
 
 12
 (16) The State Board of Elections has no prescribed procedure to prevent private individuals who request voter information at the offices of a local registrar from using voters' social security numbers for purposes unrelated to the electoral process. The State Board of Elections' position is that no law requires it to have such a procedure, and it is further the State Board of Elections' position that no such procedure can effectively be devised.
 
 
 13
 (17) The State Board of Elections discloses voter lists containing voters' social security numbers to political parties and candidates in order to enable the two major political parties to keep track of voters when they move from place to place.
 
 
 14
 (18) The Virginia State Board of Elections prepares lists of registered voters and supplies these lists to local registrars prior to each general election. The statewide voter registration database is maintained and updated on a continuing basis by local registrars.
 
 
 15
 (19) Social security numbers of applicants for voter registration are not routinely verified. The State Board of Elections believes that such requirement would necessitate approval by the U.S. Department of Justice under the Federal Voting Rights Act. However, local registrars ask for verification of social security numbers when, it appears to be the same as the social security number of a previously registered voter.
 
 
 16
 (20) The Virginia State Board of Elections does not provide information regarding registered voters to any Virginia Governmental Agency other than those to which information is required to be disclosed pursuant to the Virginia Code.
 
 
 17
 ....
 
 
 18
 (22) The Virginia State Board of Elections is unaware of any situations in which political parties or candidates for office, upon examination of Voter Registration Lists, have prevented voter fraud through the use of social security numbers of Registered Voters. However, the Virginia State Board of Elections frequently uses the social security number to identify duplicate registration, thereby helping to prevent voter fraud.
 
 
 19
 Joint Appendix (J.A.) at 36-40.
 
 
 20
 On January 17, 1992, the district court held that the Board did not comply with § 7(b) of the Privacy Act. Greidinger v. Davis, 782 F.Supp. at 1108-09. As a result, the district court ordered the Board to submit a schedule for prospective compliance with § 7(b) of the Privacy Act and to submit a summary of the measures to be taken to effectuate compliance with the notice requirements of § 7(b). The district court went on to reject Greidinger's constitutional challenge to Virginia's voter registration scheme. Id. at 1109-10. Applying strict scrutiny, the district court reasoned that Virginia's voter registration scheme was necessary to promote the compelling state interest of conducting fair and honest elections.[4] The district court observed that numerous state interests were advanced by the Virginia voter registration scheme, namely: the scheme eliminated voter duplication and possible fraud; allowed Virginia to keep track of voters who move to different locales; and assisted Virginia in eliminating disqualified voters from voter lists. Id. at 1110. Finally, the district court denied Greidinger's request for attorneys' fees, reasoning that the Privacy Act limits any award of fees and costs to willful or intentional conduct. Id. at 1110-11.
 
 
 21
 Prior to the district court's decision, the Board began to draft a proposed Privacy Act notice to be used with new registration forms. The day after the district court's decision, the Board submitted a proposed notice to comply with the dictates of the Privacy Act. This notice was to be posted at all voter registration sites. The new notice informed registrants that the SSN was required under Va. Const. art. II, § 2. The notice also stated that the voter registration card containing the voter's SSN would become part of the permanent voting records and would be open to inspection by any Virginia voter. Finally, the notice stated that computerized listings containing the information on the voter registration would be furnished upon request to elected officeholders, candidates for office, political parties, courts, and nonprofit organizations promoting voter participation and registration, for use on a restricted basis. See infra note 6.
 
 
 22
 On January 27, 1992, Greidinger filed a motion to alter or amend the district court's judgment. On February 12, 1992, the district court rejected Greidinger's request, finding no errors or mistakes which required correction. On March 17, 1992, Greidinger filed a motion for entry of final judgment on his constitutional claim, followed by a motion for reconsideration. On May 1, 1992, the district court entered a final judgment and order, finding that the proposed Privacy Act notice complied with the mandates of the Privacy Act and denying Greidinger's motion for reconsideration. Greidinger noted a timely appeal.
 
 II
 
 23
 Greidinger argues that the "public disclosure" accompanying Virginia's requirement that he provide his SSN on his voter registration application unconstitutionally burdens his right to vote as protected by the First and Fourteenth Amendments. In making this argument, Greidinger attacks two components of Virginia's voter registration scheme. He objects to Virginia's permitting registered voters to obtain another registered voter's SSN via § 24.1-56, which provides that all registration books, containing all of the registration forms, "shall be opened to the inspection of any qualified voter."[5] He also objects to § 24.1-23(8) which allows dissemination of a registered voter's SSN to a candidate for election or political party nomination, political party committee or official, incumbent office holder, and nonprofit organization which promotes voter participation and registration.[6]
 
 
 24
 Notably, Greidinger does not challenge Virginia's receipt and internal use of his SSN. He challenges only the dissemination of the SSN to the public pursuant to § 24.1-23(8) (candidates, political parties and officials, incumbents, and nonprofit organizations which promote voter participation and voter registration) and § 24.1-56 (general public). In addition, Greidinger does not assert any constitutional right to privacy in his SSN. Rather, he argues that the privacy interest in his SSN is sufficiently strong that his right to vote cannot be predicated on the disclosure of his SSN to the public or political entities.
 
 
 25
 It is axiomatic that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1976); see also Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886) (right to vote regarded as a fundamental right because it preserves all other rights); Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) ("[A]ny restrictions on that right [to vote] strike at the heart of representative government."). Despite the fundamental nature of the right to vote, states may nevertheless impose certain qualifications on and regulate access to the franchise. Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed.2d 1072 (1959). Such powers have been employed to restrict the franchise in numerous contexts. See, e.g., Marston v. Lewis, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (residency); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (age minimum); and Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (interested voter status). As the Supreme Court recognized in Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974):
 
 
 26
 [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.
 
 
 27
 Id. at 730, 94 S.Ct. at 1279. However, the state's broad power to regulate the franchise "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens." Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986).
 
 
 28
 The difficulty of the inquiry can best be seen through an observation the Supreme Court made almost twenty years ago in Storer. In assessing the validity of state election laws under the Equal Protection Clause, the Court observed:
 
 
 29
 It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a matter of degree, very much a matter of consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.
 
 
 30
 415 U.S. at 730, 94 S.Ct. at 1279 (citations and internal quotes omitted).
 
 
 31
 We must begin our inquiry by determining the proper standard to be applied to the statutes at issue. We look for guidance in cases involving voter qualifications and ballot access.[7] In the context of voter qualifications, traditional equal protection strict scrutiny analysis has been applied. See Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (" '[B]efore that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interest served by it must meet close constitutional scrutiny.' ") (quoting Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970)); Hill v. Stone, 421 U.S. 289, 297, 95 S.Ct. 1637, 1643, 44 L.Ed.2d 172 (1975) (Any restrictions other than residence, age, and citizenship must promote compelling state interests.). In applying strict scrutiny, the Supreme Court has invalidated certain measures enacted by states. See, e.g., Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (right to vote predicated on $1.50 poll tax violates equal protection); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (striking down white primary laws); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (striking down on equal protection grounds statute that prevented resident military personnel from voting where stationed); and Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (striking down statute that prevented non-property owners from voting in school district election as violative of equal protection).
 
 
 32
 In each of these cases, the state law under attack prohibited an identified class of persons from voting. Obviously, the statutes at issue in this case do not impose such a prohibition, but rather place a burdensome condition on the exercise of the fundamental right to vote. In such cases, the Supreme Court has never clearly determined that strict scrutiny should apply. These murky waters become more lucid to the extent that the Court has distinguished between provisions that result in "an absolute denial of the franchise" and provisions that made "casting a ballot easier for some." Kramer, 395 U.S. at 626 n. 6, 89 S.Ct. at 1889 n. 6. For example, in upholding a state's decision not to provide absentee ballots to pretrial detainees, notwithstanding the fact that absentee ballots were available to others, the Court applied the "rational basis" test. McDonald v. Bd. of Election Commissioners, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969).
 
 
 33
 The Court also applied the "rational basis" test in upholding a state law which conditioned the right to vote in a party primary on the voter's registering as a party member thirty days prior to the previous general election. This registration date was eight months prior to the presidential primary and eleven months prior to the non-presidential primary. Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). Initially, the Court noted that the plaintiffs comprised a group of individuals who could have registered in time for the primary, but for one reason or another failed to do so. Id. at 755 and n. 4, 93 S.Ct. at 1248 and n. 4. The Court used this observation to distinguish those cases along the Carrington-Dunn line which had applied strict scrutiny. Id. at 757, 93 S.Ct. at 1249. The Court stated that, in the Carrington-Dunn line of cases, "the State [had] totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote." Id. at 757, 93 S.Ct. at 1249. Comparing the statutes in the Carrington-Dunn line of cases to the New York statute before it, the Court stated that the New York statute "did not absolutely disenfranchise the class to which petitioners belong--newly registered voters who were eligible to enroll in a party before the previous general election." Id. The Court then concluded that to the extent the plaintiffs' "plight can be characterized as disenfranchisement at all, it was not caused by [the New York statute], but by their own failure to take timely steps to effect their enrollment." Id. at 758, 93 S.Ct. at 1250. The Court applied the "rational basis" test and upheld the statute.
 
 
 34
 The Supreme Court's continued reliance on the "absolute denial" distinction made in Rosario is called into question when examining recent ballot access decisions. In ballot access cases, prior to the Anderson decision, the Supreme Court generally applied equal protection strict scrutiny. Williams, 393 U.S. at 30-32, 89 S.Ct. at 10-11; Bullock, 405 U.S. at 142-44, 92 S.Ct. at 855-56; Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); Illinois Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); but see, Clements v. Fashing, 457 U.S. 957, 965-66, 102 S.Ct. 2836, 2844-45, 73 L.Ed.2d 508 (1982) (plurality opinion) ("[n]ot all ballot access restrictions require 'heightened' equal protection scrutiny").
 
 
 35
 However, in Anderson, the Court elected not to rest its decision on equal protection grounds, but rather directly on the First and Fourteenth Amendments. 460 U.S. at 786 n. 7, 103 S.Ct. at 1569 n. 7 ("In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis."). See also, Norman v. Reed, --- U.S. ----, ---- n. 8, 112 S.Ct. 698, 705 n. 8, 116 L.Ed.2d 711 (1992) (quoting Anderson for the same proposition). The Anderson Court, however, found it helpful to rely on prior cases using the Equal Protection Clause analysis. 460 U.S. at 786 n. 7, 103 S.Ct. at 1569 n. 7 ("We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment."); Norman, --- U.S. at ---- n. 8, 112 S.Ct. at 705 n. 8 (quoting Anderson for the same proposition).
 
 
 36
 In Anderson, the Court again recognized that determining whether a restriction is valid or invalid "cannot be resolved by any 'litmus-paper test.' " 460 U.S. at 789, 103 S.Ct. at 1570 (quoting Storer, 415 U.S. at 730, 94 S.Ct. at 1279). In response, the Court developed an analytical framework that amounted to a weighing of factors. This framework essentially retained the individual components of the strict scrutiny calculus:
 
 
 37
 [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and the strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
 
 
 38
 Anderson, 460 U.S. at 789, 103 S.Ct. at 1570.
 
 
 39
 Relying on the First and Fourteenth Amendments, the Court in Anderson held unconstitutional an Ohio statute that required an independent candidate for President, John Anderson, to file both a statement of candidacy and a nominating petition in March in order to appear on the general election ballot in November. In assessing the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments, the Court noted that the early filing deadline could have a substantial impact on independent-minded voters and candidates because the March deadline would thwart the possibility of "a newly emergent candidate [that] could serve as the focal point for a grouping of Ohio voters who decide, after mid-March, that they are dissatisfied with the choices within the two major parties." Id. at 791, 103 S.Ct. at 1571.
 
 
 40
 Ohio proffered three state interests that justified the restriction: (1) voter education, (2) equal treatment, and (3) political stability. Id. at 796, 103 S.Ct. at 1574. While the Court agreed with Ohio that it had a legitimate state interest in fostering informed and educated expression, the Court found that Ohio's interest did not justify the specific restriction at issue because the restriction had the potential to actually deprive the Ohio electorate of valuable understanding of the issues that an independent candidate could have contributed. Id. at 798, 103 S.Ct. at 1575. In addition, the Court in Anderson was neither persuaded that Ohio's interest in equal treatment was achieved by the March deadline, nor persuaded that the March deadline could be justified on the basis of Ohio's interest in political stability.
 
 
 41
 More recently, the Supreme Court ameliorated the ambiguity caused by Anderson with respect to the level of scrutiny to be applied when it returned to a straightforward strict scrutiny test. In Norman, the Court stated:
 
 
 42
 To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify this limitation, and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance.
 
 
 43
 Id. --- U.S. at ----, 112 S.Ct. at 705. (citations omitted). Similar to Anderson, Norman involved a situation in which a state had promulgated statutes making it difficult, but not impossible, for a new political party to obtain a position on the ballot. Returning to traditional strict scrutiny analysis, the Court struck two of the statutes at issue. The Court concluded that neither provision was narrowly tailored to meet the interests of Illinois. Id. at ---- - ----, 112 S.Ct. at 705-08.
 
 
 44
 Similar to previous cases which employed equal protection analysis in assessing the propriety of various statutes in voter qualification and ballot access cases, Anderson and Norman recognize the precious nature of the individual and state rights at issue and the delicate balancing required to achieve electoral harmony. Anderson and Norman are also illustrative of the Supreme Court's recent focus on the degree of the burden imposed on the exercise of associational or voting rights as opposed to the "absolute denial" of associational or voting rights which the Court found critical in Rosario. Thus, the critical distinction between the McDonald- Rosario line and the Carrington-Dunn/Anderson- Norman lines is whether the statute at issue imposes a substantial burden on the associational rights or voting rights at stake. Storer, 415 U.S. at 729, 94 S.Ct. at 1278 ("substantial burdens on the right to vote or associate for political purposes are constitutionally suspect and invalid under the First and Fourteenth Amendments and under the Equal Protection Clause unless essential to serve a compelling state interest."); Bullock, 405 U.S. at 144, 92 S.Ct. at 856 ("Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in Harper, that the laws must be 'closely scrutinized.' "). If a substantial burden exists, a common sense reading of the cases in both areas suggests that the restrictions on the right to vote must serve a compelling state interest and be narrowly tailored to serve that state interest. Generally, this is the conventional approach employed in assessing First Amendment deprivations. Storer, 415 U.S. at 759-62, 94 S.Ct. at 1293-95 (Brennan, J., dissenting).
 
 
 45
 * Before we begin examining the burden on Greidinger's right to vote, we note that the Virginia statutes at issue, for all practical purposes, condition Greidinger's right to vote on the public disclosure of his SSN. Admittedly, at first glance, the disclosure of a SSN to the general public is a rather subtle price to pay to exercise the right to vote. Nevertheless, it is nothing short of a condition on the exercise of that right. To be sure, by definition, the fact that the SSN may be potentially disseminated to any registered voter or political party with the attendant possibility of a serious invasion of one's privacy is demonstrably more restrictive than predicating the right to vote on the simple receipt and internal use of the SSN. By allowing the SSN to be disseminated to registered voters or political parties upon request, Virginia's voter registration scheme conditions the right to vote on the consent to the public disclosure of a would-be voter's SSN.
 
 B
 
 46
 Because Virginia's voter registration scheme conditions Greidinger's right to vote on the public disclosure of his SSN, we must examine whether this condition imposes a substantial burden.
 
 
 47
 Originated in 1936, a SSN is a nine-digit account number assigned by the Secretary of Health and Human Services for the purpose of administering the Social Security laws. See 42 U.S.C. § 405(c)(2)(B). SSNs were first intended for use exclusively by the federal government as a means of tracking earnings to determine the amount of Social Security taxes to credit to each worker's account. Over time, however, SSNs were permitted to be used for purposes unrelated to the administration of the Social Security system. For example in 1961, Congress authorized the Internal Revenue Service to use SSNs as taxpayer identification numbers. Pub.L. No. 87-397, 75 Stat. 828 (codified as amended at 26 U.S.C. §§ 6113, 6676).
 
 
 48
 In response to growing concerns over the accumulation of massive amounts of personal information, Congress passed the Privacy Act of 1974. This Act makes it unlawful for a governmental agency to deny a right, benefit, or privilege merely because the individual refuses to disclose his SSN. In addition, Section 7 of the Privacy Act further provides that any agency requesting an individual to disclose his SSN must "inform that individual whether that disclosure is mandatory or voluntary, by what statutory authority such number is solicited, and what uses will be made of it." At the time of its enactment, Congress recognized the dangers of widespread use of SSNs as universal identifiers. In its report supporting the adoption of this provision, the Senate Committee stated that the widespread use of SSNs as universal identifiers in the public and private sectors is "one of the most serious manifestations of privacy concerns in the Nation." S.Rep. No. 1183, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News 6916, 6943. In subsequent decisions, the Supreme Court took notice of the serious threats to privacy interests by the mass accumulation of information in computer data banks. For example, in Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), in rejecting a privacy challenge to a New York statute that: (1) required doctors to disclose to the state information about prescriptions for certain drugs with a high potential for abuse and (2) provided for the storage of that information in a centralized computerized file, the Court observed:
 
 
 49
 We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of all criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures.
 
 
 50
 Id. at 605, 97 S.Ct. at 879 (footnote omitted).
 
 
 51
 Since the passage of the Privacy Act, an individual's concern over his SSN's confidentiality and misuse has become significantly more compelling. For example, armed with one's SSN, an unscrupulous individual could obtain a person's welfare benefits or Social Security benefits, order new checks at a new address on that person's checking account, obtain credit cards, or even obtain the person's paycheck. Elizabeth Neuffer, Victims Urge Crackdown on Identity Theft, BOSTON GLOBE, July 9, 1991, at 13, 20 (In Massachusetts, "[a]uthorities say that, with another person's Social Security number, a thief can obtain that person's welfare benefits, Social Security benefits, credit cards or even the victim's paycheck."); Michael Quint, Bank Robbers' Latest Weapon: Social Security Numbers, N.Y. Times, September 27, 1992, at 7 (SSN can be used to order new checks at a new address).[8] In California, reported cases of fraud involving the use of SSNs have increased from 390 cases in 1988 to over 800 in 1991. Y. Anwar, Thieves Hit Social Security Numbers, San Francisco Chronicle, August 30, 1991, A1, A2. Succinctly stated, the harm that can be inflicted from the disclosure of a SSN to an unscrupulous individual is alarming and potentially financially ruinous. These are just examples, and our review is by no means exhaustive; we highlight a few to elucidate the egregiousness of the harm.[9]
 
 
 52
 The degree of the burden on Greidinger's right to vote can also be seen through the case law's uniform recognition that SSNs are exempt from disclosure under Exemption 6 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(6), because their disclosure would "constitute a clearly unwarranted invasion of privacy." See, e.g., I.B.E.W. Local No. 5 v. HUD, 852 F.2d 87, 89 (3d Cir.1988) (disclosure of SSN constituted unwarranted invasion of privacy under FOIA). Further Congressional recognition of the privacy concerns is evident from § 7 of the Privacy Act which prohibits the denial of any right, benefit, or privilege by a governmental agency because of an individual's refusal to disclose his SSN.
 
 
 53
 The statutes at issue compel a would-be voter in Virginia to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote. As illustrated by the examples of the potential harm that the dissemination of an individual's SSN can inflict, Greidinger's decision not to provide his SSN is eminently reasonable. In other words, Greidinger's fundamental right to vote is substantially burdened to the extent the statutes at issue permit the public disclosure of his SSN.[10]
 
 C
 
 54
 Having identified that Greidinger's right to vote is substantially burdened by the public disclosure of his SSN, we must next determine whether Virginia has advanced a compelling state interest that justifies the disclosure and dissemination of his SSN. If Virginia advances a compelling state interest, we must determine whether disclosure of the SSN is narrowly tailored to fulfill that state interest.
 
 
 55
 With respect to § 24.1-56, Virginia stipulated in the district court that it had no state interest in disseminating SSNs to private individuals. On appeal, Virginia argues that the disclosure of SSNs is a safeguard against voter fraud. With respect to § 24.1-23(8), in addition to preventing voter fraud, Virginia argues that the statute furthers Virginia's interest in promoting "participation in the electoral process." Appellee's Brief at 26. Unquestionably, Virginia has a compelling state interest in preventing voter fraud, Storer, 415 U.S. at 732-33, 94 S.Ct. at 1280 (state has a compelling interest in protecting the integrity of the electoral process), and promoting voter participation. However, the inquiry does not end here. We must determine whether the disclosure of the SSN under § 24.1-23(8) and/or § 24.1-56 is narrowly tailored to fulfill that state interest. We conclude that it is not.[11]
 
 
 56
 Virginia's voter registration form requires a registrant to supply, among other things, his name, address, SSN, age, place of birth, and county of previous registration. Virginia's interest in preventing voter fraud and voter participation could easily be met without the disclosure of the SSN and the attendant possibility of a serious invasion of privacy that would result from that disclosure. Accord, Pilcher v. Rains, 853 F.2d 334, 337 (5th Cir.1988) (requirement that voters signing ballot access petition supply "voter registration number" not necessary to distinguish among voters sharing common names).[12] Most assuredly, an address or date of birth would sufficiently distinguish among voters that shared a common name. Moreover, the same state interest could be achieved through the use of a voter registration number as opposed to a SSN. Following this tack, Virginia would derive the same benefits as the disclosure of a SSN. Thus, to the extent § 24.1-23(8) and § 24.1-56 allow Virginia's voter registration scheme to "sweep[ ] broader than necessary to advance electoral order," Norman, --- U.S. at ----, 112 S.Ct. at 706, it creates an intolerable burden on Greidinger's fundamental right to vote.
 
 III
 
 57
 In summary, we hold to the extent that § 24.1-23(8) and/or § 24.1-56 permit the public disclosure of Greidinger's SSN as a condition of his right to vote, it creates an intolerable burden on that right as protected by the First and Fourteenth Amendments. Accordingly, the judgment of the district court is reversed. We remand the case to the district court to give the Commonwealth of Virginia the responsibility to cure this constitutional infirmity by either deleting the requirement that a registrant disclose his SSN or eliminating the use of SSNs in voter registration records open to public inspection and contained in voter registration lists provided to candidates for election, political party committees and officials, incumbent office holders, and non-profit organizations which promote voter participation and registration. We also remand the case for further proceedings on the Privacy Act notice, which will have to be revised in light of our decision, and the issue of attorneys' fees.[13]
 
 
 58
 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 Those parties obtaining the computerized voting lists pursuant to § 24.1-23(8) must sign an oath averring to limit the use of the computerized voter lists to the specific purposes enumerated in the statute. See infra note 6. The record also reflects that the current cost of a statewide voter registration list is $5,700
 
 
 [2]
 By agreement of the parties, Robert H. Davis was dismissed as a defendant
 
 
 [3]
 The State Board of Elections oversees local registrars, publishes a handbook of procedures, maintains the statewide computerized voter registration system, and prescribes voter registration cards and forms. Local registrars supervise voter registration, assist local electoral boards in conducting elections and maintain records required by law. Va.Code Ann. § 24.1-19 and § 24.1-46
 
 
 [4]
 In reaching this conclusion, the district court characterized the burden on Greidinger's fundamental right to vote as "minimal." Greidinger v. Davis, 782 F.Supp. at 1110
 
 
 [5]
 In full, § 24.1-56 provides:
 Books open to public inspection.--Registration books shall be kept and preserved by the general registrar and shall be opened to the inspection of any qualified voter at the office of the registrar when the office is open for business. In addition, such book shall be available for inspection upon appointment, which appointment the general registrar shall make for all reasonable times requested. In any event, such books shall be available at additional days and times fixed by the secretary of the electoral board.
 
 
 [6]
 In full, § 24.1-23(8) provides:
 Furnish, at a reasonable price, precinct lists for their districts to courts of the Commonwealth and the United States for jury selection purposes, to candidates for election or political party nomination to further their candidacy, political party committees or officials thereof for political purposes only, incumbent officeholders to report to their constituents; nonprofit organizations which promote voter participation and registration for that purpose only; and for no other purpose and to no one else. In addition, any general registrar whose records of registered voters are automated may furnish such lists to courts of the Commonwealth and the United States for jury selection purposes. Precinct lists shall be by printout or by magnetic tape to be used on computer equipment as may be requested.
 Any person receiving such precinct lists shall take and subscribe to the following oath:
 I understand that the lists requested are the property of the State Board of Elections of the Commonwealth of Virginia (or name of appropriate county or city) and I hereby affirm that I am a person authorized by § 24.1-23 of the Code of Virginia to receive a copy of the precinct lists described; and I further affirm that the lists will be used only for the purposes prescribed and for no other use, and that I will not permit the use or copying of such lists by persons not authorized by the Code of Virginia to obtain them.
 (Seal) Signature of Purchaser....
 
 
 [7]
 The Board argues that we should ignore ballot-access precedent because we have before us a voting rights case. This argument has been categorically rejected by the Supreme Court. See Anderson v. Celebrezze, 460 U.S. 780, 786, 103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983) (" '[T]he rights of voters and the rights of candidates do not lend themselves to neat separation.' ") (quoting Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)); Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) (noting associational and voting rights are "different, although overlapping, kinds of rights")
 
 
 [8]
 In greater detail, the Quint article paints a rather frightening portrait of what harm can come by the disclosure of an individual's SSN:
 For example, a Manhattan executive returned from vacation last month to a call from Citibank asking her about an unusual pattern of transactions in her accounts. Someone, armed with her Social Security number, had called the bank to request a change of address and order new checks (billed to her account, of course) and a replacement bank card.
 Not content with plundering the checking account, the thief, whose identity has not been determined, also sought and received approval for telephone banking, allowing money to be transferred from the executive's account to her account by telephone. Because she had been accumulating money in the savings account to pay for home renovations, the thief found a lode much larger than normal for an individual's checking account.
 
 
 [9]
 Other uses include unlocking the door to another's financial records, investment portfolios, school records, financial aid records, and medical records
 
 
 [10]
 Most importantly, we note that Virginia's voter registration scheme imposes a substantial burden on Greidinger's fundamental right to vote only to the extent that the scheme permits the public disclosure of his SSN. If the scheme provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist
 
 
 [11]
 Unquestionably, Virginia has a compelling state interest that is narrowly tailored in the receipt and internal use of a SSN. The internal use of SSNs assists in, among other things, identifying voter duplication and tracking felons
 
 
 [12]
 Interestingly, the Board never explains how the disclosure of SSNs to political parties furthers Virginia's interest in electoral participation. More to the point, the Board never explains why a SSN is more necessary to further voter participation than the name, address, date of birth, and other voter registration information already provided
 
 
 [13]
 In light of our decision, we believe it is unwise to review the district court's determination on the issue of attorneys' fees at this time